# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| HIGHLINE INNOVATION INVESTMENT PARTNERSHIP, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>BIOLERT, LTD.; GUY WILNAI; RUBEN KUZNIECKY; URI KRAMER; HEZY SHALEV,<br><br>        Defendants. | Civil Action No. 4:21-cv-615<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

**COMES NOW,** Plaintiff Highline Innovation Investment Partnership, LLC ("Highline") for its Complaint against Defendants Biolert, Ltd., Guy Wilnai, Ruben Kuzniecky, Uri Kramer, and Hezy Shalev and states as follows:

## THE PARTIES

1. Plaintiff, Highline, is a Texas limited liability company with its offices located at 17440 Dallas Parkway, Suite 230, Dallas, Texas 75287.  Highline's single member is a citizen of the State of Texas.

2. Defendant Biolert, Ltd. ("Biolert") is an entity formed under the laws of the State of Israel with its principal offices located at Rehov Yoni Netanyahu 20, Givat Shmuel Israel.

3. Defendant Guy Wilnai is an individual residing in Los Angeles County, California and is a citizen of the State of California.

4. Defendant Ruben Kuzniecky is an individual residing in New York County and is a citizen of the State of New York.

5. Defendant Uri Kramer is an individual residing in Tel Aviv, Israel, and is a citizen of the State of Israel.

6. Defendant Hezy Shalev is an individual residing in Los Angeles County, California and is a citizen of the State of California.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and, as alleged in paragraphs 1 through 6 above, there is complete diversity of citizenship between Highline and Defendants.

8. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a majority of the actions giving rise to this litigation occurred in Collin County, Texas. In addition, the transaction underlying the causes of action set forth in this complaint arose out of the binding term sheet attached hereto as Exhibit A (the "Term Sheet") between Highline and Biolert.  The Term Sheet – which was executed by Defendants Wilnai, Kuzniecky, Kramer and Shalev (collectively, the "Control Defendants") – contains a venue provision that mandates "[a]ny dispute or controversy arising under or related in any way to this Term Sheet shall be adjudicated by a court of competent jurisdiction located in the state or federal courts in Collin County, Texas."

## NOTICE; CONDITIONS PRECEDENT

9. All conditions precedent to recovery have been met, have occurred or have been waived.  Pre-suit notice was sent to Biolert and the Control Defendants to the extent required under the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §17.01 *et seq.* or other state or federal law.

## FACTUAL BACKGROUND

10. Biolert is an entity that claims to have developed "the industry's first actionable seizure alert system that uses off-the-shelf wearable technology—making the system accessible to anyone living with epilepsy" referred to herein as the "Biolert System." (*See* https:facebook.com/BioLert attached hereto as Exhibit B.) The Biolert System is built upon a proprietary software algorithm that runs on a user's smartwatch. This software monitors a user for abnormal movements that are indicative of an epileptic seizure and sends an alert to one or more of the user's designated caregivers by text, automated voicemail and email. Biolert further claims that the Biolert System is "based on a patented technology *with notable detection accuracy and low-to-zero false alarms*." (Ex. B) (emphasis added).

11. On information and belief, the Control Defendants are Biolert's largest shareholders having acquired their shares either as a founder (Mr. Kramer) or as investors (Messrs. Kuzniecky, Wilnai, and Shalev) and – directly or through nominees – own a majority, controlling interest in Biolert.

12. On information and belief, the Control Defendants collectively own 52.557% of Biolert: Wilnai (21.475%); Kuzniecky (6.492%), Kramer (16.551%); and Shalev (8.039%).

13. The Control Defendants also comprise the entire board of directors of Biolert.

14. In early 2018, the Control Defendants and Biolert's then-Chairman of Biolert's board of directors, Avi Yaron, commenced discussions with a group of prospective Australian investors to enter into a transaction to merge Biolert into an entity publicly listed on the Australian Securities Exchange ("ASX"). Upon consummation of that proposed transaction, the public entity would be renamed Biolert, Ltd. and would raise AUD $5 million on the Australian Stock Exchange ("ASX") from Australian and Israeli investors.

15. Mr. Yaron was terminated as a Biolert employee and as a member of the company's board of directors by the Control Defendants in August 2018.

16. In anticipation of that merger transaction, Mr. Yaron, Mr. Kramer and Biolert's then-President, Ron Nag, traveled to Australia and had multiple meetings with prospective investors to showcase Biolert's technology and the efficacy and accuracy of the Biolert System.

17. On information and belief, Mr. Nag was also a member of the Biolert board of directors during this time.

18. As part of these meetings, the Control Defendants and Mr. Yaron prepared the investor PowerPoint presentation attached hereto as Exhibit C (the "June 2018 Presentation"). Messrs. Yaron, Kramer and Nag disseminated this document to groups of retail and institutional investors in multiple investor roadshows that were held in several cities throughout Australia.

19. The June 2018 Presentation promoted to prospective investors the innovative aspects of the Biolert System noting that Biolert's proprietary software algorithm utilized "Machine learning/Artificial Intelligence ("AI") for *personalized analytics, false alarm & seizure detection*." (Ex. C at Slide 6, Slide 9) (emphasis added).

20. On information and belief, software developers use machine learning to create an algorithm that is 'adaptive' so its behavior can change (by deriving new and important insights) over time based on new data obtained from users of the software.

21. The fact that Biolert employed machine learning for its proprietary software algorithm would have been extremely important to prospective investors because machine learning is an artificial intelligence technique that is used to design and train software algorithms to learn from and act on data.  Specifically, by gathering user movement data which would then be analyzed by machine learning, Biolert was confirming to investors that its software was able

to better recognize and adapt to user movements that were not epileptic seizures (thereby decreasing false alarms) and movements that were epileptic seizures (thereby increasing seizure detection accuracy).

22. The June 2018 Presentation also touted to prospective investors that Biolert had entered into a study with the Epilepsy Foundation of Texas ("EFTX") that resulted in missed seizure detection rate of less than 5% and that EFTX was "Supporting BioLert for national endorsement after successful testing of efficacy and usability." (Ex. C at Slide 7.) EFTX is one of the largest of the fifty state affiliates of the Epilepsy Foundation which is the nationwide epilepsy umbrella organization that provides community services, public education, advocacy, seizure first aid training, and research funding to the more than 3.4 million individuals in the United States that suffer from epilepsy.

23. Given that Biolert's target market was the U.S. epilepsy community, conducting a successful study with EFTX that resulted in EFTX supporting Biolert for endorsement by the national Epilepsy Foundation would undoubtedly be something that prospective investors would deem critical to ensure adoption of the Biolert System by the epilepsy community.

24. In addition, the June 2018 Presentation highlighted to prospective investors the accuracy of the Biolert System noting that it had accumulated patient monitoring data for the entire year in 2017 and that based on that extensive data set, false alarms during the day averaged "less than 0.1 per day" (with zero false alarms at night) while seizures were accurately detected by the Biolert System 95.2% of the time. (Ex. C at Slide 11.)

25. The extremely low rate of false alarms and incredibly high percentage of seizure detection highlighted in the June 2018 Presentation could only have been achieved if Biolert had

extensively used machine learning/artificial intelligence to train its proprietary software algorithm.

26. The extraordinary accuracy of the Biolert System – almost no false positives and nearly flawless seizure detection accuracy – would have been an essential selling point to prospective investors because it showcased the competitive advantage that the Biolert System had over other seizure detection technologies.

27. Later that year, several Biolert employees attended the American Epilepsy Society annual meeting ("AES"). AES is the largest meeting of epilepsy and clinical neurophysiology professionals in the world, and it is typically attended by several thousand doctors, clinicians, and medical device company representatives. AES showcases the latest research, products, services and technology related to epilepsy and other neurology-related disorders to investors and members of the epilepsy community. In anticipation of AES, the Control Defendants and Mr. Nag prepared the investor PowerPoint presentation attached hereto as Exhibit D (the "AES Presentation") which was disseminated to AES attendees.

28. Similar to the June 2018 Presentation, Biolert used the AES Presentation to highlight the company's use of "Machine learning / Artificial Intelligence ("AI") for personalized analytics, false alarm & seizure detection" and to tout the accuracy of the Biolert System noting that Biolert had monitored 27 patients, accumulated more than 41,000 hours of patient seizure monitoring data and that the Biolert System had an extraordinary seizure detection accuracy of 95% with less than one false positive per week. (Ex. D at Slide 6, Slide 13.)

29. On information and belief, Biolert's discussions with the prospective Australian investors was necessitated by the company's deteriorating financial condition, due to significant

cash-flow issues and mounting vendor debts and outstanding loans.  This funding shortfall had become so critical that in September 2018 the Control Defendants and Mr. Nag had to each personally loan funds to Biolert (the "Control Defendant Loans") to keep the company operational.  By mid-December 2018, Biolert was in default on repayment of the Control Defendant Loans.  In addition to the Control Defendant Loans, Biolert had also issued a short-term promissory note on October 9, 2018, for a $125,000 loan from an unaffiliated third-party (the "Short-Term Note").  By its terms, the Short-Term Note would shortly mature on February 28, 2019.  Even worse for Biolert, the Short-Term Note contained a confession of judgment provision that mandated that upon an event of default (*i.e.*, non-repayment of the loan), Biolert authorized any court of competent jurisdiction to enter a judgment against the company without the need for the holder of the debt to even file a collection action.

30. Later in December 2018, the prospective Australian investors, informed the Control Defendants that they would not go forward with the merger transaction and capital raise due to a disagreement over the number of investor representatives to be nominated to the Biolert board of directors.  The decision not to proceed with that transaction was potentially catastrophic to the Control Defendants because without an imminent influx of investment capital, the Control Defendants not only had no hope of recovering the monies they loaned to Biolert but they also stood to lose the monies they had invested in Biolert.

31. In January 2019, without any viable sources of investment capital and with the Control Defendants unwilling to loan additional monies to fund Biolert's operations or to pay the company's debts and faced with the fast-approaching maturity date in the Short-

Term Note, Mr. Wilnai commenced negotiations with Highline for the sale of the Biolert System including Biolert's intellectual property assets.

32. As part of its due diligence obligations, Biolert provided information and documents to Highline about the Biolert System. Included in these documents were the June 2018 Presentation (Ex. C) and the AES Presentation (Ex. D) as well as other documents prepared by the Biolert board of directors (including, the Control Defendants) which touted Biolert's advanced technology, and which underscored the accuracy of the Biolert System. In addition, the Control Defendants and Mr. Nag had multiple discussions with Highline representatives during which, among other things, they repeatedly highlighted the very low rate of false positives and extraordinarily high rate of seizure detection of the Biolert System – all of which were purportedly supported by Biolert's accumulation of thousands of hours of patient monitoring data.

33. Based upon the information and documents about the Biolert System provided by Biolert and the representations made by the Control Defendants about the Biolert System, Highline entered into the Term Sheet with Biolert on February 11, 2019. (Ex. A.) Pursuant to the Term Sheet, Highline assumed and paid $300,651.31 of Biolert's trade debts and other obligations (collectively, the "Biolert Obligations") and guaranteed a $52,000 promissory note issued by Biolert to Mr. Yaron (Biolert's former Chairman of the board of directors) (Ex. A) to settle two lawsuits that Mr. Yaron had filed against Biolert after his termination by the Control Defendants.

34. The accelerated entry into the Term Sheet was necessitated by the imminent maturity and required repayment of the Short-Term Note which, with principal and interest, amounted to nearly half of the Biolert Obligations. Also included within the Biolert Obligations

was repayment of the Control Defendant Loans which Biolert had defaulted on as well as reimbursement of certain travel-related expenses incurred by Mr. Shalev as a result of Mr. Yaron's lawsuits against Biolert.  The Term Sheet also contemplated that the parties would negotiate a future on-going running royalty rate for any Highline products that incorporated the Biolert System.

35. During the negotiations for a future on-going running royalty, representatives for Highline discovered that nearly all of the claims about Biolert's technology and the accuracy of the Biolert System in the information and documents that Biolert provided to Highline as well as the representations made by the Control Defendants to Highline representatives about the Biolert System that were made duringthe course of Highline's due diligence of the Biolert System were patently false.

36. For example, Highline discovered that the Biolert System never utilized artificial intelligence, machine learning, or any adaptive algorithms for that matter, which flatly contradicted the statements made in Biolert's due diligence documents (including, the June 2018 Presentation and the AES Presentation) and the representations made by the Control Defendants that Biolert's proprietary software algorithm utilized "Machine learning/Artificial Intelligence ("AI") for *personalized analytics, false alarm & seizure detection*."  (*See* Ex. C at Slide 6, Slide 9; Ex. D at Slide 13) (emphasis added).)  Even worse, Highline also ascertained that <u>a purposeful decision had been made by the Biolert board of directors not to implement machine learning or artificial intelligence algorithms in the Biolert System</u>.  Biolert's and the Control Defendants' brazen deception about utilizing machine learning/artificial intelligence to train the Biolert System was subsequently confirmed in an email to Highline from Biolert's Chief Technology

Officer that "Biolert never applied any [Machine Learning] Algorithm to improve accuracy." (*See* August 2019 email from Ketan Malani attached hereto as Exhibit E.)

37. In addition, Biolert's and the Control Defendants' oft-repeated representations to prospective investors and to Highline about the Biolert System's very low rate of false positives and extremely accurate seizure detection also turned out to be fabricated. After discovering that Biolert had never implemented machine learning/artificial intelligence to train its software, Highline representatives contacted several users of the Biolert System and found out that Biolert never verified with such users the patient monitoring data logged by the Biolert System as a "seizure event" or as a "false alarm" to confirm the accuracy of these designations. The fact that Biolert never required any tracking of seizure events and/or false positives meant that Biolert had never validated the authenticity of any of their patient monitoring data and, therefore, any claims about the accuracy of the Biolert System were completely baseless.

38. On August 8, 2019, Highline contacted Mr. Wilnai via email and laid out the damning information that it had discovered about the falsity of the representations made by Biolert and the Control Defendants (the "August 2019 Email"):

> First, there was never an Epilepsy Foundation of Texas study. Stephanie was able to get two individuals with epilepsy in Texas to beta test the Biolert software as a service seizure detection system in 2017. One of these individuals never used the watch at all because she disliked how it looked; the other individual discontinued using the watch after less than two weeks due to connectivity issues and a high rate of false seizure alarms. I also spoke to the caregiver for this latter individual and she told me that they were experiencing significantly more than the 0.2 false seizure alerts per day noted in Slide 11.
>
> Second, based on the email below with Ron it is clear that Biolert's purported results did not encompass a 12-month period in 2017. Even worse (and as Ron clearly stated in his email), if Biolert's 2017 results had included the May-August 2017 period when NO seizures were detected, the actual seizure detection rate was much

Page 10 of 20

> lower than the figure put out by Biolert in Slide 11. It is also impossible that Biolert's algorithm achieved the results noted in Slide 11 during the post-August 2017 period. That is because Ketan never implemented/utilized a machine learning algorithm in order to improve the functionality/accuracy of the Biolert algorithm (see the attached email exchange with Ketan).
>
> Third, for the past several weeks, Highline's quality assurance folks have been testing the Biolert algorithm and they have been unable to replicate anything close to Biolert's purported seizure detection, false alarms and missed seizure numbers. That is not surprising now that we know that the figures on Slide 11 are demonstrably false and it almost certainly means that the software as a service algorithm put together by the development team in India is fatally flawed. As an aside (you probably are aware of this anyway), Ron did confirm to me that the information in Slide11 of the June 2018 presentation was put together by Avi Yaron.

(*See* August 2019 Email attached hereto as Exhibit F.)

39. Given that Biolert had never undertaken an epilepsy seizure monitoring field "study" or clinical "study" with EFTX, it is clear that Biolert's representations in the June 2018 Presentation and the AES Presentation that this purported study with EFTX that allegedly resulted in a missed seizure detection rate of less than 5% were also false. In addition, Biolert's representation that EFTX had agreed to "support Biolert for national endorsement" was a blatant fabrication as confirmed to Highline by EFTX's Executive Director that EFTX did not and could not endorse any commercial entity to the national Epilepsy Foundation.

40. The August 2019 Email further noted that as a result of these falsehoods and misrepresentations about the accuracy and efficacy of the Biolert System, Highline would not proceed with the acquisition of the Biolert System and Biolert's intellectual property assets and that Highline would shortly be making a formal demand to the Control Defendants for a return of the monies Highline had paid for the Biolert Obligations. (Ex. F.)

41. Highline's discovery of Biolert's material and pervasive fraudulent representations which were perpetuated by the Control Defendants in discussions with Highline

representatives was subsequently confirmed in an email exchange between Highline and the caregiver of an epilepsy patient who had been specifically recruited by Biolert to use the company's seizure detection software in order to validate the accuracy of the Biolert System (the "September 2019 Email").  (*See* September 2019 Email attached hereto as Exhibit G.)

42. That caregiver informed Highline that the 34 epileptic seizures logged by the Biolert System as accurately detected seizures were, in fact, all false positives *and that Biolert had been apprised of that fact*.  Biolert willfully ignoring information that the Biolert System was recording false positives as accurately detected seizures was undisputable proof that the claims made by the Control Defendants about the accuracy of the Biolert System and the integrity of its patient monitoring data were, in fact, duplicitous.  (Ex. G.)

43. On September 26, 2019, legal counsel for Highline sent a letter (the "September 2019 Letter") to the Control Defendants demanding repayment of monies that Highline had expended for the Biolert Obligations noting that the Control Defendants' "materially false and fraudulent claims and representations purposefully touted the efficacy and purported accuracy of Biolert's epilepsy seizure monitoring application and were intended to, and did, in fact, fraudulently induce [Highline] to enter into the Binding Term sheet, caused [Highline] to assume and pay Biolert Obligations" and also resulted Highline expending costs and fees for due diligence efforts, licensing evaluation and employee and consultant time in preparing for, negotiating, and entering into the Term Sheet.  (*See* September 2019 Letter attached hereto as Exhibit H.)  Mr. Wilnai replied on behalf of the Control Defendants that they would review the allegations set forth in the September 2019 Letter and shortly respond.  The Control Defendants never responded.

44. On April 15, 2021, legal counsel for Highline again wrote the Control Defendants (the "April 2021 Letter") alleging violations of the Texas Deceptive Trade Practices-Consumer Protection Act V.T.C.A. Business and Commerce Code, Section 17.41 *et seq.* ("DTPA"), for the fraud and intentional misrepresentation that Biolert and each of the Control Defendants engaged in and perpetrated against Highline in connection with the Term Sheet. The April 2021 Letter constituted Highline's require statutory notice and demand for restitution and/or damages pursuant to the DTPA. (*See* April 2021 Letter attached hereto as Exhibit I.) The Control Defendants also failed to respond to the April 2021 Letter.

45. Highline now brings the causes of action set forth herein against Biolert and also seeks to lift the corporate veil and hold Messrs. Wilnai, Kuzinecky, Kramer and Shalev personally liable in their capacity as shareholders of Biolert and members of its board of directors and for their role in the fraud and misrepresentation they perpetrated against Highline which caused Highline to pay the Biolert Obligations and to incur damages, fees and expenses.

## CAUSES OF ACTION

## COUNT I – COMMON LAW FRAUD

46. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

47. Control Defendants caused Biolert to be used for the purpose of perpetrating an actual fraud, which was for the direct personal benefit of the Control Defendants themselves.

48. Control Defendants, using Biolert, engaged in a pervasive and elaborate scheme to sell the Biolert System, including Biolert's intellectual property assets, to Highline for valuable consideration when Control Defendants knew that a) the representations made about the accuracy and efficacy of the Biolert System were false; and b) that the Biolert System had very little to no value or use for its intended purpose.

49. Control Defendants caused Biolert to be used for the purpose of perpetrating and did perpetrate an actual fraud on Highline primarily for their direct personal benefit, which allowed them to, a) secure repayment of the Control Defendant Loans as well as certain travel expense incurred on behalf of Biolert; and b) avoid losing the money they had invested for their equity ownership stakes in Biolert.

50. Control Defendants made representations, which were false and material, which they knew at the time of the representations were false and made them with the intent that these representations would be relied upon. Highline relied on the Control Defendants' representations and Highline was damaged as a result of these representations.

51. Highline suffered injury by Control Defendants' fraud and has suffered damages.

## COUNT II: FRAUD BY NON-DISCLOSURE

52. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

53. Control Defendants, using Biolert, concealed from or failed to disclose certain facts to Highline. Specifically, Control Defendants, using Biolert, engaged in an elaborate scheme to sell the Biolert System, including Biolert's intellectual property assets, to Highline for valuable consideration far in excess of the actual value of the Biolert System by failing to disclose, a) the fact that the Biolert System did not utilize artificial intelligence, machine learning or any adaptive algorithms which were necessary to train Biolert's software to more accurately detect seizures; and b) that Biolert never verified with users of the Biolert System the patient monitoring data logged by the Biolert System as a "seizure event" or as a "false alarm" to confirm the accuracy of these designations.

54. Control Defendants had a duty to disclose accurate facts about the efficacy and accuracy of the Biolert System to Highline; the facts not disclosed were material; Control

Defendants knew Highline was ignorant of the facts and did not have an equal opportunity to discover the facts; and Control Defendants were deliberately silent when they had a duty to speak.

55. By failing to disclose the facts, Control Defendants intended to induce Highline to take some action or refrain from acting. Highline relied on Control Defendants' non-disclosure of the facts and Highline was injured and suffered damages.

56. Highline suffered injury by Control Defendants' fraud by non-disclosure and has suffered damages.

## COUNT III: FRAUD IN THE INDUCEMENT

57. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

58. Control Defendants made material misrepresentations to Highline which Control Defendants knew at the time that such representations were false or that they lacked knowledge of the truth about these representations. Specifically, Control Defendants misrepresented to Highline that, a) the Biolert System utilized artificial intelligence and machine learning to train Biolert's software when it did not; b) the Biolert System had very low false positives and extremely accurate seizure detection when it would have been impossible to determine that information given that Biolert never verified with users of the Biolert System that the patient monitoring data logged by the Biolert System were, in fact, "false alarms" or "seizure events"; c) Biolert had undertaken a "study" with EFTX and that EFTX had agreed to "support Biolert for national endorsement" to the national Epilepsy Foundation.

59. Control Defendants intended for Highline to rely or act on the misrepresentations and Highline did act on these misrepresentations as evidenced by the fact that Highline entered into the Term Sheet with Biolert.

60. Highline's reliance on Control Defendants' misrepresentations caused injury to Highline and Highline has suffered damages as a result.

### COUNT IV: LIFTING THE CORPORATE VEIL

61. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

62. On information and belief, Biolert is an entity formed under the laws of the State of Israel and therefore is subject to Israeli Companies Law 5759-1999.

63. Israeli Companies Law 5759-1999 ("Companies Law") states that a "court hearing a proceeding against a company may, in exceptional cases and for special reasons, lift the corporate veil if . . . the use of the separate legal personality of the company is intended to frustrate the intent of any law or to defraud or discriminate against any person." *See* Companies Law Part II, Ch. 6(c).

64. Companies Law further states that "[t]he lifting of the veil in order to attribute the debts of the company to one of its shareholders shall be effected while taking into account the company's ability to pay its debt." *See* Companies Law Part II, Ch. 6(d).

65. The corporate form should be disregarded because here the corporate form of Biolert was used as a sham to perpetrate a fraud.

66. Specifically, Control Defendants held out the Biolert System as "the industry's first actionable seizure alert system…based on a patented technology with notable detection accuracy and low-to-zero false alarms." (Ex. B.) As outlined in paragraphs 1 through 45, these claims are demonstrably false given that, a) the Biolert System never utilized machine learning or artificial intelligence algorithms to train its software (contrary to the representations made by Biolert and the Control Defendants); and b) Biolert never checked false alarms or seizure events

with the users of the Biolert System so it has no actual verified data to support its claims regarding the efficacy and accuracy of the Biolert System.

67. Accordingly, based on the facts set forth above, and to the extent Biolert is unable to satisfy any judgment, Highline requests this Court disregard the corporate entity and enter judgment against Biolert and/or the Control Defendants, jointly and severally, as equity requires.

### COUNT VI: NEGLIGENT MISREPRESENTATION

68. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

69. Biolert and the Control Defendants made representations in the course of their business or in a transaction in which they had a pecuniary interest.

70. Biolert and the Control Defendants represented that the Biolert System's proprietary software algorithm utilized "Machine learning/Artificial Intelligence ("AI") for *personalized analytics, false alarm & seizure detection*."  (Ex. C at Slide 6, Slide 9.)

71. Biolert and the Control Defendants represented that they had accumulated patient monitoring data for the entire year in 2017 and that based on that extensive data set, false alarms during the day averaged "less than 0.1 per day" (with zero false alarms at night) while seizures were accurately detected by the Biolert System 95.2% of the time.  (Ex. C at Slide 11.)

72. These representations made by Biolert and the Control Defendants were false and were intended to guide others, including Highline, in their business.

73. Biolert and the Control Defendants failed to exercise reasonable care in disseminating the information to potential investors, including Highline.

74. Biolert and the Control Defendants knew Highline was ignorant of the facts and did not have an equal opportunity to discover the facts.

75. Highline justifiably relied on Biolert and the Control Defendants' negligent misrepresentation and, on February 11, 2019, entered into the Binding Term Sheet transaction (Ex. A) with Biolert.

76. Highline's economic damages are a proximate result of Biolert and the Control Defendants' negligent misrepresentations. Based on Biolert and the Control Defendants' misrepresentations, Highline assumed and paid $300,651.31 of Biolert's trade debts and other obligations and guaranteed a $52,000 promissory note issued by Biolert to its former chairman of the board. (Ex. A.)

## COUNT VI: DTPA VIOLATIONS

77. Highline incorporates the allegations in paragraphs 1 through 45 as though they were fully restated herein.

78. Highline is a consumer entitled to bring this action for relief under the DTPA. The actions of Biolert and the Control Defendants outlined above constitute misrepresentations and unconscionable conduct actionable under the DTPA.

79. Specifically, Biolert and the Control Defendants committed the following acts in violation of the DTPA "laundry list," one or more of which was a producing cause of damages to Highline:

80. Representing that the Biolert System had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which it did not have;

81. Representing that the Biolert System was of a particular standard, quality, or grade when it was of another; and

82. Failing to disclose information concerning the Biolert System which was known at the time of the transaction where the failure to disclose such information was intended to

induce Highline into a transaction into which it would not have entered had the information been disclosed.

83. Highline relied on these representations and non-disclosure to its detriment.

84. Further, Biolert and the Control Defendants violated the DTPA by engaging in unconscionable conduct and/or an unconscionable course of conduct.

85. Biolert and the Control Defendants' conduct was committed knowingly, entitling Highline to seek the trebling of its economic damages in accordance with the DTPA.

86. At the time of the acts and practices set forth in paragraphs 10 through 45 above, Biolert and the Control Defendants had actual awareness that these acts and practices were false, deceptive, or unfair in that Biolert and Control Defendants knew that no machine learning or artificial intelligence algorithms had been implemented in the Biolert System and that the accuracy and efficacy of the Biolert System was not as had been represented to Highline.

87. Biolert and the Control Defendants had actual awareness of the falsity and deception of the acts and practices alleged above.

88. Biolert and the Control Defendants had the specific intent that Highline act in detrimental reliance on the falsity and deception.

89. Biolert and the Control Defendants' conduct as described herein was a producing cause of damages to Highline.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Highline demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Highline demands judgment for itself and against Biolert and the Control Defendants as follows:

   A. An award of actual damages suffered by Highline, including pre-judgment and post-judgment interest;

   B. A finding that Biolert and the Control Defendants acted with fraud, malice or gross negligence and an award of exemplary damages in the maximum amount permitted by law;

   C. A finding that Biolert and the Control Defendants' conduct in violation of the DTPA was committed knowingly and an award of additional damages under the DTPA in an amount not to exceed three times the amount of Highline's economic damages;

   D. An award of reasonable and necessary attorneys' fees pursuant to applicable law; and

   E. An award to Highline of such further relief at law or in equity as the Court deems just and proper.

Dated: August 4, 2021       DEVLIN LAW FIRM LLC

               */s/ Robert Kiddie*
               Timothy Devlin
               tdevlin@devlinlawfirm.com
               Robert Kiddie
               State Bar No. 24060092
               rkiddie@devlinlawfirm.com
               1526 Gilpin Avenue
               Wilmington, Delaware 19806
               Telephone: (302) 449-9010
               Facsimile: (302) 353-4251

               *Attorneys for Plaintiff Highline Innovation Investment Partnership, LLC*